IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LINDA C. DICK**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | Civil No. **08-630-JPG** |
| ) | |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to United States District Judge J. Phil Gilbert in accordance with 28 U.S.C. §§ 636(b)(1)(B) and (C).

Pursuant to 42 U.S.C. § 405(g), plaintiff Linda C. Dick, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i). **(Doc. 2).** In addition to submitting the administrative record **(Doc. 11 (hereinafter "R."))**, plaintiff and defendant have fully briefed their positions. **(Docs. 14 and 15)**.

## Overview of the Evidence

Plaintiff applied for DIB, alleging the onset of disability as of December 23, 2004. **(R. 52)**. She claims disability due to the combined effects of vasculitis, myelitis, degenerative disc disease of the lumbar spine, a history of headaches and fibromyalgia, bilateral carpel tunnel syndrome, Heberden's and Bouchard's nodes on the last two joints of her fingers, drowsiness

caused by medication, and breakthrough migraine headaches.

For the three years leading up to her onset date, plaintiff had been working as manager of a landscaping/lawn and garden center, until the business closed **(R. 72-73, 235 and 250)**. That job is characterized as "heavy" exertional work. **(R. 252)**. Plaintiff also has prior work experience working in customer service and bookkeeping, both of which are characterized as "sedentary, unskilled" work. **(R. 72 and 253)**. At the time of the ALJ's decision, plaintiff was just shy of 49 years old, married, with a 12th grade education. **(R. 231-232)**.

As early as July 2004, plaintiff's treating physician, Dr. Hays, thought plaintiff's arm and leg pain might be vasculitis. **(R. 146)**. By September 2004, plaintiff was taking the maximum dose of Ibuprofen, and was still experiencing what she described as "extreme" back pain, although her neck was non-tender to palpation. **(R. 145)**. Still, plaintiff reported taking a second job as a merchandiser for RC Cola. **(R. 143)**. On November 29, 2004, a biopsy confirmed "early" leukocytoclastic vasculitis. **(R. 164)**. At that time, plaintiff indicated she was experiencing chronic pain. **(R. 142-143)**. One month later, in December 2004, plaintiff reported that on some days she experienced "very severe" pain that was not relieved by pain medication. **(R. 141)**. Notes from March 2005 reflect that Dr. Hays was treating plaintiff with Vicodin and Prednisone. **(R. 140-141)**.

Plaintiff applied for benefits on March 28, 2005. **(R. 52-57)**. At that time, plaintiff was able to clean her home, vacuuming and dusting a little bit at a time. **(R. 82)**. Plaintiff was able to shop three times per month. **(R. 82)**. According to plaintiff, her arms, hands and fingers were painful and weak; she experienced some weakness, pain and tingling in her back and legs; and she tired easily, which prevented her from completing tasks. **(R. 82, 84 and 98A)**. Plaintiff

also reported having trouble concentrating, due to ringing in her ears and ear pain.  **(R. 84).**  However, plaintiff often tended to finances and paid bills, although sitting at a computer caused finger and back pain.  **(R. 86 and 89).**  At that time, plaintiff left her home approximately four times per week to run errands, go to appointments or visit family.  **(R. 85).**  She got around by walking or driving, although she could not perform either activity for as long as she had in the past.  **(R. 85).**  By her own estimation, plaintiff could sit for two hours (with changes in position); shop for an hour or hour and a half at a stretch; plant flowers two or three days per week for two hours at a time.  **(R. 88A-89).**

     Dr. Richard Brasington, a rheumatologist, saw plaintiff in May 2005, and observed that, "virtually every muscle is tender where palpated."  **(R. 120).**  Neurontin had helped plaintiff, but she could not afford the medication since losing her job; and six to eight Vicodin per day were helping somewhat.  **(R. 120).**  Dr. Brasington's nurse practitioner, Julie Unk, noted that plaintiff had Fibromyalgia Syndrome, a disc bulge at L5(left); posterior calcification at L2-3; and bilateral carpal tunnel syndrome.  **(R. 117-118).**  Nurse Unk's notes dated July 26, 2005, indicate that Robaxin and Neurontin were helping some with muscle pain and numbness and tingling in plaintiff's hands; plaintiff was also taking Vicodin.  **(R. 114).**  Plaintiff reported experiencing headaches every other day for the preceding two weeks.  **(R. 114).**

     In June 2005, an agency physician, Dr. Julio Pardo, reported that plaintiff's primary diagnoses were leukocytoplastic vasculitis.  **(R. 106).**  Dr. Pardo considered plaintiff capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing or walking for six hours during an eight hour work day; sitting for six hours of the work day, and having occasional postural limitations, albeit no limitations regarding manipulation or pushing and

pulling. **(R. 107-109).** Plaintiff was limited to "light" work, primarily due to her self-reported activities of daily living, pain and fatigue. **(R. 113).** Another agency physician, Dr. B. Rock Oh, concurred with that evaluation. **(R. 105).**

In October 2005, plaintiff reported that, at times, she was unable to hold a toothbrush, tie her shoes or write. **(R. 62).** She was weak, stiff and experiencing nerve pain; plaintiff also had trouble sleeping. **(R. 62).** Plaintiff was taking a muscle relaxer, Vicodin for pain (which she said made her tired), Neurontin for nerve pain, an anti-inflammatory, and the anti-depressant Trazadone (which plaintiff also reported made her tired). **(R. 64).**

Plaintiff saw Nurse Unk several times in 2006, and notes generally reflect that plaintiff experienced chronic pain associated with fibromyalgia, neck pain that caused some headaches, and numbness and tingling in her hands. **(R. 207-209).** In October 2006, plaintiff reported pain in her neck, arms, hands and legs. **(R. 205).** Since May 2006, plaintiff had been experiencing dizziness, and on one occasion she passed out when turning her head to the right. The dizziness had since been associated with merely standing up; she had three such episodes the day before. **(R. 205).** Nurse Unk opined that plaintiff had syncope, and referred her to a neurologist. **(R. 205).**

Neuroligist Samineh Khosrowshahi examined plaintiff in late October 2006 and found normal strength in all four extremities, normal gait and a normal CT. **(R. 197).** The doctor's notes indicate that plaintiff reported a total of four episodes where she passed out for a few seconds each time. **(R. 195).** Notes from one month later indicate no herniation of the C-spine, but changes that were consistent with a viral form of myelitis; plaintiff was also thought to have vasculitis. **(R. 192).** Subsequent tests were all inconclusive or negative. **(R. 171-194).** In

January 2007, Dr. Khosrowshahi noted fibromyalgia, chronic daily headaches, paroxysmal positional vertigo and syncopal episodes. **(R. 167).** Plaintiff was also still experiencing neck pain, but it had improved with Topamax, and she had eliminated syncopal episodes by not turning her head to the right, but she still experienced slight dizziness. **(R. 167).** By February 2007, plaintiff reported "big improvement" with Topamax. **(R. 166).** Nurse Unk's notes from April 2007 reiterate that Topamax has helped plaintiff's headaches, but that she has neck and back pain, with severe pain radiating down her left arm and hand. **(R. 205).** Examination confirmed tenderness of the neck with extension and flexion, tender chest and back muscles, bilateral tenderness in plaintiff's second metatarsophalangeal joints, with enlargement of the right joint, but no tender or swollen joints in plaintiff's hands. **(R. 205).**

By June 2007, plaintiff reported that, although she had some breakthrough headaches, overall she was "doing fine," and she had no more episodes of passing out. **(R. 165).** Dr. Khosrowshahi characterized plaintiff as having "chronic headaches, improved on Topamax." **(R. 165).** He opined that the positional syncopal effects were possibly associated with carotid hypersensitivity. **(R. 165).** In July 2007 plaintiff reported continued achiness all over, and she described herself as "doing fair," with no perceived need to change her medications. **(R. 198).** Neurontin had helped her pain "significantly." **(R. 198).** Heberden's and Bouchard's nodes were appreciated, but not such that Nurse Unk note them among her "impressions." **(R. 198).** Nurse Unk's notes indicate she perceived evidence of cervical and lumbar degenerative disc disease. **(R. 198).**

Dr. Hays, plaintiff's treating physician, issued a report dated September 27, 2007. **(R. 217-219).** Dr. Hays diagnosed plaintiff as having the following ailments, all expected to last for

5

more than 12 months: allergic rhinitis; carotid atherosclerosis; carotid stenosis; chronic cervical myalgia; fibromyalgia; GERD; IBS; and leukocytoclastic vasculitis. **(R. 217).** It must be noted that, in response to a question about when he most recently conducted an exam, he responded: "last exam: 9-20-07." **(R. 217).** However, there is no record evidence that Dr. Hays saw plaintiff on that date, or on any date since March 5, 2005. **(R. 140).** In any event, Dr. Hays opined that plaintiff was unable to work because her condition was not predictable and her "workability" varies hourly. **(R. 218).** The doctor estimated that plaintiff could stand, sit or walk for up to two hours during a workday, sitting or standing for only 15 minutes at a time, with breaks and the opportunity to reposition herself. **(R. 218).** Plaintiff would need to lie down for 15-20 minutes every hour, depending on her health; and the fact that medication caused drowsiness was noted. **(R. 218 and 220).** Occasional postural limitations were prescribed. **(R. 218).** The doctor precluded lifting more than 10 pounds on an occasional basis. **(R. 219).** Plaintiff was also precluded from pushing and pulling with both arms, but no limitations were placed on fine manipulation and simple grasping. **(R. 220).**

Plaintiff testified at an evidentiary hearing before ALJ Jacobs on October 4, 2007. **(R. 227-255).** Plaintiff explained that she made the 20 minute drive to the hearing without a problem. **(R. 232).** Plaintiff thought that her severe headaches ("migraines"), which occurred three times per week and lasted four or five hours, along with neck and back pain would preclude her from working. **(R. 237-238).** Plaintiff indicated her daily back pain ranged from five to nine on a ten scale; her neck pain was rated as seven; her arm pain ranged from five to nine and included numbness and tingling; and her leg pain was also ranged from five to nine. **(R. 238-240).**

According to plaintiff, her headaches had worsened over the previous six months. **(R. 242).** She further related that the doctor had explained to her that her dosage of Topamax would cause drowsiness until she became used to the new dosage. **(R. 241).** Plaintiff also stated that depression impacted her ability to work, although she was not in counseling. **(R. 242-243).** By plaintiff's account, she occupies her time reading and watching television; and she takes three or four naps during the day. **(R. 241 and 245).** Plaintiff reported that she cannot dress herself, as she has trouble with her shoes, bra and using snaps and buttons. **(R. 245).** Plaintiff testified that she does no housework or cooking, and that her husband manages their finances because she was unable to sit and write out checks. **(R. 246).** Plaintiff stated that she used to have headaches daily, but now they occur about three times per week. **(R. 250-251).** Plaintiff also reported that she had had migraine headaches while she was still working. **(R. 250).**

Vocational expert Darrell Taylor, Ph.D., also testified at the hearing. Although plaintiff's previous employment in the landscaping business was deemed "heavy" work, her customer service and bookkeeping work was "sedentary and semiskilled." **(R. 252-253).** Multiple hypotheticals were posed to Dr. Taylor, accounting for a variety of physical/exertional limitations. A person of plaintiff's age, with her education and work history was deemed capable of performing her past sedentary jobs, as long as she could lift up to 10 pounds frequently and occasionally, sit for six hours, and stand for up to two hours, perform frequent handling and fine finger manipulation, and have only occasional postural limitations. **(R. 253-254).** If such a person could only sit for less than six hours and stand for less than two hours, all competitive work was considered precluded. **(R. 254).** Similarly, if persistence and pace could not be maintained for less than seven hours, plaintiff's prior work and unskilled work would be

precluded. If a person suffered migraine headaches three times per week, lasting for four hours, rendering the person unable to work, all jobs would be precluded. **(R. 254).**

## ALJ Jacobs's Decision

In a written decision dated December 6, 2007, ALJ George A. Jacobs ruled that, although plaintiff had vasculitis, myelitis, degenerative disc disease of the lumbar spine, a history of headaches and fibromyalgia– all deemed serious impairments– she was not entitled to disability benefits for any period of time. **(R. 13-22).** None of those ailments, alone or in combination, were found to meet or equal the presumptively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. **(R. 15-16).** More specifically, plaintiff's fibromyalgia was not found to significantly worsen her other recognized impairments. **(R. 16).** Rather, plaintiff was found to have the residual functional capacity for sedentary work, albeit with only occasional postural activity, and no climbing ladders, ropes or scaffolding.**[1]** **(R. 17).** The ALJ also specified that plaintiff was considered able to handle and perform fine finger manipulation frequently with both hands. **(R. 16).**

In making his decision, the ALJ concluded plaintiff's medically determinable impairments could be expected to produce the symptoms plaintiff described in her testimony, but plaintiff's testimony regarding the intensity, persistence and limiting effects were not fully credible. **(R. 17).** More specifically, the ALJ excluded plaintiff's subjective allegations from the residual functional capacity assessment. **(R. 20).** The ALJ cited medical notes and tests

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 404.1567(a).**

indicating, for example, a normal motor examination, normal gait, normal rheumatoid arthritis factor as of November 2006, minimal degenerative disc disease at L4-5 and L5-S1, and some stenosis in a doppler study, but other studies reflecting normal arterial flow. **(R. 18).** The ALJ also found that plaintiff's testimony about her daily activities and impairment was contradicted by prior written reports and medical notes and findings. **(R. 18).**

Plaintiff's subjective accounts of dizziness were found to be inconsistent with the scant objective evidence: and it was stressed that plaintiff could control the incidents by not turning her head to the right. **(R. 19).** ALJ Jacobs highlighted the fact that plaintiff had not alleged dizzy spells in June and July 2007. **(R. 19).**

Relative to plaintiff's complaints of "very severe pain," the ALJ cited plaintiff's own reports in 2007 that she had been doing "fair." **(R. 19).** It was also noted that plaintiff had recently reported that her pain was "fair," and that her headaches had "decreased" with Topamax, although there was still breakthrough headache pain. **(R. 19).** The ALJ considered the headaches "essentially controlled" with medication. **(R. 19).**

The ALJ discussed plaintiff's medication history, concluding medication had helped control her headaches and pain. The ALJ observed that in the summer of 2007 plaintiff did not think her medications needed to be changed and her pain was "fair." **(R. 19-20).** The ALJ stated: "She never alleged drowsiness as a side effect of her medication." **(R. 20).**

Dr. Hays' statement was given little weight, despite the fact that he was her family physician. **(R. 20).** The ALJ observed that Dr. Hays had not examined plaintiff for two and a half years at the time he rendered his opinion. **(R. 20).** Although some of the doctor's conclusions were supported by other medical source evidence, the ALJ considered the

limitations reflective of plaintiff's subjective complaints, which the ALJ had discredited.  **(R. 20).**

The ALJ accepted the state agency consulting physicians' evaluation, but recognized that they had only considered plaintiff's vasculitis.  **(R. 21).**  Therefore, the ALJ factored in plaintiff's minimal degenerative disc disease, headaches, fibromyalgia and myelitis.  **(R. 21).**  Plaintiff was limited to only occasional postural activity; and, although her allegations of numbness and tingling were recognized, she was deemed capable of frequent handling and finger manipulation.  **(R. 21).**

Based on the aforementioned residual functional capacity for sedentary work and the vocational evidence about plaintiff's prior work, the ALJ found that plaintiff could perform her past work in customer service and bookkeeping.  **(R. 20).**  Consequently, plaintiff was found not to be disabled.  **(R. 21).**

The Appeals Council denied plaintiff's request for review of the ALJ's decision.  **(R. 3-5).**

## The Standard of Review

To be entitled to disability insurance benefits the claimant must establish that he is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." **42 U.S.C. § 423(d)(1)(A).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a

claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  *See Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. § 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  *See Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997).**  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  *Sample v. Shalala*, **999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled.  *Garfield v.*

*Schweiker*, **732 F.2d 605 (7th Cir. 1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984)**; *see also **Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the burden of proof remains with the claimant through the fourth step).**

Although the standard of review applied by this reviewing court requires the ALJ's decision to be supported by substantial evidence, an ALJ utilizes a preponderance of the evidence standard, the default standard in civil and administrative proceedings. ***Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996).**

## The Issues Presented

Plaintiff Dick claims disability since December 23, 2004. **(R. 52).** There is no dispute that plaintiff has the following "severe" impairments: vasculitis, myelitis, degenerative disc disease of the lumbar spine, a history of headaches and fibromyalgia. **(R. 15).** Plaintiff concedes that none of those ailments alone meet or equal the presumptively disabling conditions set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. **(Doc. 14, p. 4).** However, plaintiff contends ALJ Jacobs erred in his analysis of the combined effect of plaintiff's ailments, by failing to evaluate and include plaintiff's bilateral carpal tunnel syndrome and Heberden's and Bouchard's nodes on the last two joints of her fingers. Plaintiff also contends the ALJ did not sufficiently account for drowsiness caused by medication, and that he ignored that plaintiff continued to have breakthrough migraine headaches. Citing Social Security Ruling ("SSR") 96-

6p[2], plaintiff argues that it was error for the ALJ not to have enlisted a physician to evaluate whether the combined effect of plaintiff's ailments was the equivalent of a presumptively disabling impairment. Lastly, plaintiff asserts that the ALJ discounted the opinion of plaintiff's treating physician, Dr. Hays, based on the mistaken belief that the doctor had not treated plaintiff in two and a half years. From plaintiff's perspective, Dr. Hays' opinion was consistent with the opinions of plaintiff's rheumatologist, Dr. Brasinger, and nurse practitioner Julie Unk, who often examined plaintiff on behalf of Dr. Brasinger.

## Analysis

In accordance with plaintiff's arguments, the Court's analysis focuses on steps three and four in the analytical framework.

Social Security Ruling ("SSR") 96-6p offers guidance relative to the determination of medical equivalence to the listings of presumptively disabling impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ is charged with deciding the legal question of whether a listing is met or equaled; however, as a matter of policy, the judgment of a physician designated by the Commissioner is required for consideration. The ALJ is not bound by the opinion of an agency or program consulting physician relative to medical equivalence. An updated medical opinion regarding equivalence is required when additional medical evidence is received that, "in the opinion of the administrative law judge" may change a previous opinion that there is no equivalence. Thus, plaintiff's assertion that the ALJ was absolutely required to secure an additional evaluation is incorrect.

---

[2]Plaintiff also cites the unpublished, non-precedential case *Wadsworth v. Astrue*, 2008 WL 2857326 (S.D.Ind. July 21, 2008).

In the situation at bar, agency physicians offered an opinion in June 2005.  **(R. 105-113).**  As the chronological outline above indicates, at that time, plaintiff had been diagnosed with early leukocytoclastic vasculitis, and she had complained of pain in her neck, back, arms, hands (including tingling), legs and virtually every muscle– all purportedly unrelieved by medication.  She also had reported ringing in her ears, ear pain, trouble concentrating and fatigue.  Plaintiff had been seen by Dr. Brasington, the rheumatologist, and she was being monitored by Nurse Unk.  Fibromyalgia had been indicated, and bilateral carpel tunnel syndrome and frequent headaches had been noted.  The agency physicians specifically noted arm, leg and back pain, leukocytoclastic vasculitis, fatigue and pain.  **(R. 13).**  In rendering their opinion indicating that plaintiff remained capable of "light" work, they also considered plaintiff's activities of daily living.  **(R. 13).**

ALJ Jacobs mistakenly stated that the agency physicians had considered *only* plaintiff's vasculitis, when their report reflects otherwise.  **(***See* **R. 13).**  The ALJ went on to factor in disc disease, headaches, fibromyalgia and myelitis– concluding plaintiff could perform sedentary work.  **(R. 21).**  The ALJ addressed the equivalency issue relative to vasculitis, myelitis, chronic fatigue syndrome and fibromyalgia as individual impairments, and the overarching impact of fibromyalgia on plaintiff's other symptoms.  **(R. 15-16).**  The ALJ also addressed evidence favorable to plaintiff's position and he explained why that evidence was rejected.  Plaintiff's physicians offered no other opinions specifically addressing equivalence, but Dr. Hays' opinion regarding plaintiff's residual functional capacity and ability to work was thoroughly addressed.

Although the ALJ did not specifically state that he did not perceive the need for an additional agency evaluation, he thoroughly addressed the evidence of plaintiff's condition post

June 2005– evidence that does not suggest a substantial change from the factors mentioned in the agency physician's 2005 report. Thus, this Court finds no error in the ALJ's failure to secure an additional medical evaluation regarding the equivalence of plaintiff's ailments (individually or collectively).

Plaintiff also argues that the ALJ erred by failing to evaluate and include plaintiff's bilateral carpal tunnel syndrome and Heberden's and Bouchard's nodes on the last two joints of her fingers. An ALJ need not address every piece of evidence in detail, but significant evidence must be addressed and an explanation for why strong evidence favorable to the claimant is overcome by other evidence. *Giles ex rel. Giles v. Astrue,* **483 F.3d 483, 488 (7th Cir. 2007).**

The only mention of carpal tunnel syndrome in the medical records appears in Nurse Unk's June 2005 notes. **(R. 117).** Similarly, Heberden's and Bouchard's nodes are mentioned only once, in Nurse Unk's July 2007 notes.[3] **(R. 198).** There are no test results specifically referencing those conditions, and no physician personally made those diagnoses. Plaintiff herself did not specifically mention those conditions. Thus, this Court does not consider those impairments to be significant.

Although ALJ Jacobs did not specifically mention those impairments, plaintiff's complaints of hand swelling, pain and tingling, as well as limitations relative to holding, grasping and manipulation, were addressed. **(R. 17-18 and 21).** The ALJ also noted that tests showed a normal rheumatoid arthritis factor in November 2006. **(R. 17).** Plaintiff's varying and contradictory statements about her ability to handle buttons, snaps and the like were also

---

[3]As plaintiff observes, Heberden's and Bouchard's nodes are bony growths and swelling in the finger joints that are associated with osteoarthritis. **(Doc. 14, p. 6).**

15

considered by the ALJ. **(R. 18).** Furthermore, even Dr. Hays (who offered the most pessimistic opinion of plaintiff's condition) did not opine that plaintiff had limitations relative to fine manipulation and simple grasping. **(R. 220).** Nevertheless, in consideration of allegations of numbness and tingling, the ALJ considered plaintiff's handling and fine finger manipulations should be performed only "frequently" (meaning less than 2/3 but more than 1/3 of the time). **(R. 21).** Consequently, the impact of any carpal tunnel syndrome and/or Heberden's and Bouchard's nodes was addressed by the ALJ.

Plaintiff also contends the ALJ did not sufficiently account for drowsiness caused by medication, and that he ignored that plaintiff continued to have breakthrough migraine headaches. However, a review of the ALJ's decision reveals the following statements:

> Consider the evidence regarding plaintiff's headaches. In October 2006 the claimant said she had daily generalized headaches without nausea or vomiting (Ex. 1F p. 92). In February 2007, the claimant said her headaches had decreased since she began taking Topamax (Ex. 1F p. 62). She said she had noticed " a big improvement" (Ex. 1F p. 62). In April 2007, the claimant said medication had helped alleviate her headache pain somewhat (Ex. 1F p. 99). By June 2007, she said she had only some breakthrough headache pain (Ex. 1F p. 61). Thus, treatment essentially controlled the claimant's headaches.

**(R. 19).** "In sum, medication helped control the claimant's headaches and pain." **(R. 20).** In addition, "headaches" are specifically enumerated among plaintiff's recognized impairments in the ALJ's conclusion regarding his assessment of her residual functional capacity. **(R. 21).**

The ALJ clearly recognized that plaintiff continued to have breakthrough headaches. The ALJ explained that he did not find plaintiff's subjective complaints to be credible; he offered the aforementioned survey of the evidence; he observed that in the summer of 2007 plaintiff had described her pain as "fair;" and he also noted plaintiff's own opinion that her

16

medications did not need to be changed. Without plaintiff's testimony that her breakthrough headaches would preclude her from working **(R. 237-238)**, the ALJ was left with only the aforementioned treatment notes from 2007, which indicate with only exceptions, medication did control plaintiff's headaches. Thus, the topic was thoroughly addressed; plaintiff just does not like that there was scant evidence of how breakthrough headaches impacted plaintiff.

ALJ Jacobs was clearly incorrect when he stated, "[Plaintiff] never alleged drowsiness as a side effect of her medication." **(R. 20).** Drowsiness was noted. **(R. 64).** However, excluding plaintiff's testimony, which the ALJ did not find credible, plaintiff had not complained since October 2005 that her medications made her drowsy, and in 2007 she had indicated her medication did not need to be adjusted in any manner. **(R. 64 and 198).** Plaintiff's testimony indicated that her doctor had opined at some point that drowsiness would cease once she adjusted to her dosage of Topamax. **(R. 241).** As defendant points out, plaintiff shoulders the burden relative to functional limitations, and the credible evidence of the impact of drowsiness is scant, once her testimony about having to nap during the day is taken away. Thus, this Court finds no error in the ALJ's misstatement about drowsiness, in that the impact of any drowsiness is negligible and predicted to be short-lived.

Plaintiff argues that it was error for ALJ Jacobs to give little weight to Dr. Hays' 2007 report regarding plaintiff's residual functional capacity and inability to perform work. Residual functional capacity is an *administrative assessment* of what work-related activities a claimant can perform despite his or her limitations. *See* **20 C.F.R. § 404.1545(a); and *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).** "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the

17

record." *Id.*   A treating source's opinion will generally be given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. . . ." **20 C.F.R. § 404.1527(d)(2);** *Simila v. Astrue*, **573 F.3d 503, 514 (7th Cir. 2009).**  An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.  *See Diaz v. Chater*, **55 F. 3d 300, 308 (7th Cir. 1995).**

The ALJ concluded that Dr. Hays had not examined plaintiff during the two and a half years preceding his report, meaning that the doctor based his opinion on the other medical records and plaintiff's subjective complaints.  **(R. 20-21).**  Plaintiff highlights Dr. Hays' response to a question on the report form about when he most recently conducted an exam; Hays responded: " last exam: 9-20-07."  **(R. 217).**  In addition, from plaintiff's perspective, Dr. Hays' opinion is consistent with the opinions of plaintiff's rheumatologist, Dr. Brasinger, and nurse practitioner Julie Unk, who often examined plaintiff on behalf of Dr. Brasinger.

There are no medical record reflecting that Dr. Hays examined plaintiff after May 2005 **(R. 140-141).** There is no evidence of anyone treating plaintiff on September 20, 2007. Moreover, Dr. Hays indicated he was relying on various tests, exams and consults– all performed by others, and he lists diagnoses that were virtually all made by others.  **(R. 217).**  In any event, as discussed above, the ALJ justifiably concluded that plaintiff's subjective accounts of her impairment were not credible, and he offered a relatively exhaustive discussion of the medical evidence (most of which has been discussed above).   Plaintiff suggests that the medical records of Dr. Basinger and/or Nurse Unk support Dr. Hays' residual functional capacity, but plaintiff does not specify how that is so.  Again, the ALJ's opinion offers a thorough survey of

the medical evidence, which adequately supports the ALJ's conclusion that plaintiff was capable of sedentary work.

If the district court agrees that the ALJ did not err in any of the ways suggested by plaintiff and analyzed above, then there is adequate support for the ALJ's reliance upon the vocational testimony and the ultimate conclusion that plaintiff could perform her past sedentary work.  Plaintiff does not specifically take issue with the ALJ's conclusion that she was not credible, and it is that finding that is the linchpin of the ALJ's analysis.

### Recommendation

For the aforestated reasons, it is the recommendation of this Court that the decision of the Commissioner of Social Security to deny plaintiff  Linda C. Dick Disability Insurance Benefits or a Period of Disability be affirmed in all respects.  If this recommendation is adopted, final judgment in favor of the defendant and against plaintiff should be entered.

**DATED: March 1, 2010**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

### Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(d), the parties shall file (meaning receipt by the Clerk of Court) any objections to this report and recommendation on or before **March 18, 2010**.  No extensions will be granted.